Crystal WILLIAMS, Petitioner

v.

## UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 27, 2007.

Decided June 8, 2007.

Eileen D. Yacknin, Pittsburgh, for petitioner.

Beth S. Harris, Asst. Counsel and Gerard M. Mackarevich, Deputy Chief Counsel, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, and FRIEDMAN, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Senior Judge McCLOSKEY.

Crystal Williams (Claimant) petitions for review of an order of the Unemployment Compensation Board of Review (Board), affirming the decision of a Referee and denying Claimant benefits on the grounds of willful misconduct, pursuant to Section 402(e) of the Unemployment Compensation Law (Law).[1] We affirm.

University of Pittsburgh Medical Center (Employer) hired Claimant to work as a billing/registration clerk in 1994. She worked for Employer until February 15, 2006, at which time she was terminated for violating Employer's harassment policy.

At the hearing before the Referee, Tracy Rechter, a human resources consultant for Employer, testified regarding Employer's written harassment policy. Ms. Rechter explained that the policy defined harassment as "verbal or physical conduct that demeans or shows hostility or hatred towards an individual because of his or her race, color, religion, sex, sexual orientation, national origin, age or disability or that of his or her relatives, friend or associates." (Original record, Referee hearing at 15). The policy further provided that "harassing conduct includes but is not limited to the following[:] nicknames, slurs, labels, negative stereotyping or threatening, intimidating or hostile acts that relate to race, color, religion, sex, sexual orientation, national origin, age or disability." (Origi-

---

1. Act of December 5, 1936, Second Ex.Sess., P.L. (1937), 2897, *as amended*, 43 P.S. § 802(e).

nal record, Referee hearing at 15). A violation of the policy provides for a penalty up to and including immediate discharge. (Original record, Referee hearing at 15).

Ms. Rechter explained that Employer's policies are posted on the company's infonet to which Claimant has access. The employees were also given copies of the harassment policy. Additionally, the policy was also part of Employer's diversity training program, which Claimant attended.

Ms. Rechter explained that an employee had made a written complaint that Claimant had used the term "zebra" to describe biracial children. Following an investigation of the complaint and an interview with the Claimant, wherein Claimant admitted to using the term, Claimant was fired.

Dana Klein, a co-worker, testified on behalf of Employer. She stated that she filed a complaint against Claimant regarding racial remarks made by Claimant.

Ms. Klein, who is white, testified that Claimant, who is black, informed Ms. Klein not to drink out of her cup as Claimant did not want to turn white. Claimant also stated, when discussing a black professional football player, that she was glad he was not with a white woman. Also, when family members of a co-worker arrived at work, Claimant asked the family members if they had brought the "zebra baby" with them. (Original record, Referee hearing at 21).

Ms. Klein explained that she has two biracial children. Ms. Klein claimed that Claimant was aware of this prior to making the statements about "zebras." Ms. Klein also claimed that when she gave birth to her biracial daughter, Claimant

informed her that her daughter would be confused about what color she was.

Ms. Klein stated that on February 13, 2006, Claimant returned to work following a dentist appointment. In discussing a child she saw during the appointment, she stated that she was "cute for a Zebra." (Original record, Referee hearing at 21). Ms. Klein stated that she was hurt and offended by the comment and that she considered it to be a racial slur.

Ms. Klein stated on one occasion, when Claimant made a comment about "a zebra," Ms. Klein responded by saying "I think you forget that I'm white when you say such things." (Original record, Referee hearing at 22). However, the comments continued.

Chekesha Fincher, a co-worker, also testified on behalf of Employer. She claimed to be present when family members of another co-worker arrived at work and Claimant noted that they did not bring the "little zebra baby" with them. Ms. Fincher stated that she was offended and insulted by the remark as she had friends with biracial children.

Next to testify was Claimant. She stated that on February 13, 2006, she made the comment "I would have been in hours ago but my dentist's daughter, cute as she can be, bad little zebra, was having a fit and a tantrum which got her behind," (Original record, Referee hearing at 38). She stated that she used the term "zebra" to refer to children half black and half white, but that she did not consider it to be a derogatory or hurtful term.[2]

The Referee determined that Claimant's used of the word "zebra" was a violation of Employer's harassment policy. As such, it was determined that Claimant's actions constituted willful misconduct. Claimant

2. Claimant also introduced the testimony of some of her fellow co-workers who stated that

they were not offended by the use of the term "zebra."

then appealed to the Board. The Board found Employer's witnesses to be credible. The Board further found that Claimant's use of the word "zebra" constituted a nickname or label relating to race, which violated Employer's harassment policy. It was determined that Claimant did not establish good cause for this violation. As such, the decision of the Referee was affirmed.[3]

Claimant now appeals to this Court.[4] Claimant alleges that she did not know the term "zebra" was offensive, that the term "zebra" is not a racial slur and that she did not deliberately violate Employer's policy.

Willful misconduct is defined as follows: (1) an act of wanton or willful disregard of the employer's interest; (2) a deliberate violation of the employer's rules; (3) a disregard of standards of behavior which the employer has a right to expect of an employee; and (4) negligence indicating an intentional disregard of the employer's interest or the employee's duties and obligations to the employer.

*Altemus v. Unemployment Compensation Board of Review*, 681 A.2d 866, 869 (1996), *petition for allowance of appeal denied*, 547 Pa. 757, 692 A.2d 567 (1997).

In the instant case, Employer's allegation of willful misconduct stems from the alleged violation of a work rule. To meet its burden of proof in establishing willful misconduct in the violation of a work rule, an employer must establish the existence of the rule, its reasonableness, and that the employee was aware of its existence. *Bishop Carroll High School v. Unemployment Compensation Board of Review*, 125 Pa.Cmwlth. 302, 557 A.2d 1141 (1989), *petition for allowance of appeal denied*, 525 Pa. 604, 575 A.2d 569 (1990). Employer must also establish that the employee actually violated the rule or policy in question. *Arbster v. Unemployment Compensation Board of Review*, 690 A.2d 805 (Pa.Cmwlth.), *petition for allowance of appeal denied*, 549 Pa. 718, 701 A.2d 579 (1997). Once employer has met its burden, the burden shifts to the claimant to prove that the rule was unreasonable or that there was good cause for violating it. *Gillins v. Unemployment Compensation Board of Review*, 534 Pa. 590, 633 A.2d 1150 (1993).

In the present case, Employer presented evidence establishing that it had a harassment policy that prohibited the use of racial nicknames, slurs or labels and that Claimant was aware of the policy. Claimant did not deny that she was aware of the policy and admitted that she called biracial children "zebras" in front of her co-workers. As such, Employer met its burden of establishing that Claimant violated a known work rule.

Claimant argues that she had good cause for violating the rule in that the term "zebra" is not offensive and, even if it is offensive, she did not intend it to be offensive. The Board rejected Claimant's argument that she did not know the term "zebra" was offensive. We accept the

**3.** The Board further found that Claimant's use of the word "zebra" was a violation of the standard of behavior an employer has a right to expect from an employee.

**4.** Our scope of review is limited to determining whether the Claimant's constitutional rights were violated, whether an error of law was committed, or whether substantial evidence supports the findings of fact. *Steinberg Vision Associates v. Unemployment Compensation Board of Review*, 154 Pa.Cmwlth. 486, 624 A.2d 237 (1993). Whether a Claimant's conduct constitutes willful misconduct is a question of law subject to our review. *Kelly v. Unemployment Compensation Board of Review*, 747 A.2d 436 (Pa.Cmwlth.2000).

Board's determination as to Claimant's credibility in claiming that she did not know that the term was offensive.[5]

We further note that Claimant admitted that it was her intent to use the term "zebra" to describe biracial children. This was an intentional violation of Employer's harassment policy as the policy prohibited the use of racial nicknames, slurs or labels. As Claimant intended to use the term "zebra" as either a racial nickname, slur or label, it is irrelevant whether or not she also intended it be offensive.[6]

Accordingly, the order of the Board is affirmed.

## ORDER

AND NOW, this 8th day of June, 2007, the order of the Unemployment Compensation Board of Review is affirmed.

## DISSENTING OPINION BY Judge FRIEDMAN.

I respectfully dissent. This case is about Crystal Williams (Claimant), an African–American female whose employment with the University of Pittsburgh Medical Center (Employer) was terminated because Claimant used the word "zebra" during a casual work break conversation to refer to her dentist's bi-racial child. The majority holds that Claimant is not entitled to unemployment benefits because her use of the word "zebra" violates Employ-

**5.** "[T]he Board is the ultimate fact finder and is empowered to make credibility determinations." *Hempfling v. Unemployment Compensation Board of Review*, 850 A.2d 773, 777 (Pa.Cmwlth.2004).

**6.** Claimant also argues that Employer fired her for using a racial slur and, as such, the Board could not find that she committed willful misconduct due to the use of a racial nickname or label. We disagree. Claimant was fired for using the term "zebra" in violation of Employer's harassment policy. (Origi-

er's harassment policy, which prohibits the use of racial slurs and demeaning nicknames and labels relating to race.

I am troubled by the use of any words in the workplace that create a hostile environment, whether the words are racially or ethnically harassing or simply known to offend a co-worker. However, the record in this case establishes that the word "zebra" is not necessarily a racial slur or a demeaning word when used to refer to a bi-racial child and that, prior to the incident leading to her discharge, no one informed Claimant that her use of the word "zebra" was offensive or that Claimant should not use it in reference to a bi-racial child. We must look through narrow lenses to determine whether a particular word used in the workplace constitutes a racial slur or a demeaning word when relating to race. Otherwise, we thwart the intent of racial harassment policies by transforming them into political correctness policies.

## I. Findings of Fact

Having explained my struggle with this case, I now present the relevant findings of the UCBR.[1]

2. The employer has a policy that prohibits harassment, which includes conduct that demeans an individual based on race or color, and provides that violating the policy could result in immediate discharge.

nal Record, letter of termination at 3). Under the policy, harassment includes the use of nicknames, labels, slurs, negative stereotyping or threatening, intimidating or hostile acts that relate to race.

**1.** Although the majority recites selected testimony given by witnesses at the hearing before the referee, the majority does not set forth the findings of fact made by the UCBR. The conclusions of law in this case must flow from the UCBR's findings of fact.

3. The employer's harassment policy defines harassment as including using nicknames, labels, slurs, or negative stereotypes that relate to race or color.

. . . .

7. The claimant knew that one of her Caucasian co-workers had two bi-racial children.

. . . .

9. The claimant . . . referred to bi-racial children in front of co-workers as "zebras" on more than one occasion.[2]

10. After the claimant had referred to bi-racial children as "zebras," the Caucasian co-worker with bi-racial children stated that "you forget that I'm white."[3]

11. The claimant was also told by a co-worker that she should not make those comments.[4]

12. At least two of the claimant's co-workers felt the claimant's labeling of bi-racial children as "zebras" was a racial slur and were offended by the comments.[5]

13. On February 13, 2006, the claimant intentionally referred to her dentist's bi-racial child as a "zebra" in front of co-workers.[6]

14. The claimant's Caucasian co-worker with bi-racial children reported the claimant's behavior to the employer.[7]

15. The employer conducted an investigation of the incident.

16. The claimant admitted to the employer that she called a bi-racial child a "zebra" in front of co-workers.

17. The employer discharged the claimant immediately upon conclusion of

2. Claimant used the term once on January 27, 2006, and twice on February 13, 2006. (*See* Claimant's brief at 20–21.)

3. This incident occurred on January 27, 2006. The Caucasian co-worker with bi-racial children testified that she repeated Claimant's "zebra" comment out loud so that everyone standing at Employer's front desk could hear it. (N.T. at 26.)

> CL But you didn't find [the word "zebra"] so offensive that you . . . shouldn't have repeated it yourself out loud?
> EW2 No.

(N.T. at 26.) The UCBR made no finding based on this testimony.

4. The co-worker warned Claimant about the use of the word "zebra" **after** the February 13, 2006, incident that led to Claimant's termination from employment. (N.T. at 46.) Thus, I submit that the UCBR's finding is misleading.

5. The two co-workers who felt this way did not tell Claimant that they were offended and did not ask Claimant to stop using that word. (N.T. at 27–28, 35.) The UCBR made no

finding based on this evidence. In addition, as indicated above, the Caucasian co-worker with the bi-racial children testified that she was not so offended that she could not repeat the word "zebra" out loud so that everyone at Employer's front desk could hear it being used to refer to bi-racial children. (N.T. at 26.)

6. Claimant was in a garage on a work break with two or three co-workers when she used the word "zebra." (N.T. at 32.) However, the UCBR made no finding based on this evidence. The Caucasian co-worker with bi-racial children was in the garage, but there is some dispute in the record as to whether she was involved in the conversation between Claimant and her co-workers or simply overheard the conversation. (N.T. at 32, 53–54.) The UCBR did not resolve this conflict in its findings of fact.

7. The record contains evidence showing that the Caucasian co-worker with bi-racial children disliked Claimant for reasons other than Claimant's use of the word "zebra" to describe bi-racial children. (N.T. at 29, 68–69; O.R., ex. R20.) However, the UCBR made no finding based on this evidence.

the investigation for violating the employer's harassment policy.

(UCBR's Findings of Fact, Nos. 2–17.) In the discussion portion of its decision, the UCBR found that Claimant's use of the word "zebra" on February 13, 2006, was a racial slur and a demeaning nickname or label relating to race. (UCBR's op. at 3.) The UCBR then concluded that Claimant deliberately violated the harassment policy on February 13, 2006, by using the word "zebra" to refer to a bi-racial child.

## II. Refusal to Permit Testimony

Although the majority does not address the issue, Claimant argues that the referee abused his discretion in refusing to permit Claimant to present the testimony of Tehira Bland to show that using the word "zebra" to describe bi-racial children is not a racial slur or a demeaning nickname or label. I agree with Claimant.

Bland was a female African–American, who would have testified that her cousins have bi-racial children and refer to them as "cute little zebras" and that she has heard adults use the word "zebra" in an affectionate way when speaking to each other. (N.T. at 59–60, 62–63.) The referee did not allow Bland's testimony because Bland could not testify that, in her experience, adults use the word "zebra" when speaking to other adults at work, i.e., outside the marriage relationship. (N.T. at 63.) However, in order to show a violation of the harassment policy, Employer had to prove that Claimant used a racial slur or a demeaning nickname or label, and Bland's testimony would have shown that "zebra" is not necessarily a racial slur or a demeaning nickname or label.

Because the only question was whether Claimant violated Employer's harassment policy by using a racial slur or a demeaning nickname or label, I would conclude that the referee lacked a valid reason for excluding Bland's testimony regarding the use of the word "zebra."

## III. Substantial Evidence

Claimant argues that the record lacks substantial evidence to support the UCBR's finding that using the word "zebra" to describe bi-racial children is a racial slur or a demeaning nickname or label relating to race. I agree.

To meet its burden of proving that "zebra" is a racial slur or a demeaning nickname or label, Employer presented three witnesses. Tracy Rechter, Employer's human resources consultant, testified that she had never heard the word "zebra" applied to bi-racial people. (N.T. at 18.) Therefore, Rechter could not testify from personal knowledge about the connotations of the word "zebra" when used to describe a bi-racial person.

Dana Klein, the Caucasian co-worker with bi-racial children who filed the complaint against Claimant, testified that the word "zebra" offended her because "a zebra is an animal, and I don't think anyone's children should be compared with an animal." (N.T. at 21–22.) In other words, Klein did not take offense at the use of the word "zebra" because of its bi-color, bi-racial connotation. Therefore, although Klein's testimony would support a finding that the word "zebra" is demeaning when applied to anyone's children, it would not support the UCBR's finding that the word "zebra" is **racially** demeaning when applied to bi-racial children.

Chekesha Fincher, an African–American co-worker, testified that she was embarrassed and offended by Claimant's use of the word "zebra" because she has friends with bi-racial children. (N.T. at 34.) However, Fincher agreed that "reasonable people could have different opinions about whether that term is offensive or not." (N.T. at 35.) Such testimony establishes only that the word "zebra" is not a racial

slur *per se* but is a term that has more than one meaning or connotation when referring to bi-racial children.[8]

## IV. Violation of Harassment Policy

Claimant argues that her use of the word "zebra" to describe a bi-racial child, which was offensive only to **some** co-workers, does not constitute a violation of Employer's harassment policy. I agree.

I recognize that Employer's harassment policy serves a salutary purpose. Employers must be vigilant in their efforts to make certain that their employees are free from a hostile work environment. However, in this case, I submit that Employer's interpretation of its policy has transformed the policy on harassment into a policy on political correctness. Indeed, this case is about the use of a word that **offends some people,** not a word like the "N-word." If Employer intends its harassment policy to be, in reality, a political correctness policy and expects the policy to prevent any employee from ever being offended by **anything** said in the workplace, then the only standard for determining a violation of the policy is subjective employee sensitivities.[9]

In my view, the UCBR was required to use an objective standard to determine whether Claimant deliberately violated Employer's harassment policy. The fact that two co-workers were offended by the word "zebra" does not mean that Claimant deliberately harassed them. The harassment policy prohibits the use of words that (1) demean (2) an individual in the workplace (3) based on race. To "demean" an individual based on race is "to lower [him or her] in character, status or reputation" based on race. Merriam Webster's Collegiate Dictionary 331 (11th ed.2004).

Here, on February 13, 2006, Claimant referred to her dentist's bi-racial child as a "zebra" in front of co-workers. Although Claimant did not direct the remark at any particular co-worker, Klein took the remark personally because Klein has bi-racial children. No one complained to Employer, except Klein, who testified that she was offended because of her personal belief that people should not compare any children to animals. In other words, Klein did **not** feel demeaned **based on race.** Inasmuch as Claimant did not demean an individual in the workplace based on race, I would conclude that Claimant did not violate Employer's policy.

## V. Relevant Case Law

Claimant argues that this case is analogous to *Poplin v. Unemployment Compen-*

8. I note that Claimant attaches to her brief documents that were **not** introduced into the record to show that the word "zebra" is not a demeaning term when applied to bi-racial people. Moreover, in the argument portion of her brief, Claimant discusses research that she has done showing that the word "zebra" is often used to refer to bi-racial people in a positive manner. (Claimant's brief at 16–18.) Because this material is not part of the record, this court may not consider it. Nevertheless, the record evidence clearly shows that the word "zebra" is not necessarily a demeaning term when applied to bi-racial people.

9. Thus, in this case, two people were offended by Claimant's use of the word "zebra" to refer to a bi-racial child. Obviously, the word did not offend Claimant, who has bi-racial relatives herself, but the UCBR rejected Claimant's testimony. (N.T. at 46.) However, the UCBR did not reject the testimony of Carol Nolder, a co-worker who has relatives with bi-racial children, who heard Claimant use the word "zebra" on February 13, 2006, and who was not offended. (N.T. at 49, 54, 56.) The UCBR did not reject the testimony of Ellen Kytic, a co-worker who testified that she is not offended by the use of the word "zebra" to describe bi-racial children. (N.T. at 56, 58.) Finally, if the referee would have allowed Bland's testimony, Bland could have established that some adults use the word "zebra" to refer to their own bi-racial children in an affectionate manner. (N.T. at 62.)

*sation Board of Review,* 690 A.2d 781 (Pa. Cmwlth.1997) (*en banc*). The majority, inexplicably, does not address this argument.

In *Poplin,* the claimant, while preparing a work schedule, came across two names beginning with the letter "K" and stated in the presence of a black co-worker, "one more K and we could have the Ku Klux Klan here." *Id.* at 782–83. When the black co-worker put his head down on a desk, the claimant realized that her comment had offended him. The claimant apologized because "you're not supposed to say anything in front of a black." *Id.* at 785 (Friedman, J., dissenting). The claimant then asked the co-worker "if he wished that he was white." *Id.* at 783. The co-worker responded "No," left work early and reported the incident to the employer. *Id.* The employer fired the claimant, and the claimant applied for unemployment benefits, which were denied. This court held that the comments did **not** rise to the level of willful misconduct, explaining:

> By this decision we do not mean to suggest that employers should tolerate or condone racial insensitivity. Promoting, indeed insisting, upon cooperation and understanding among racially diverse employees is indispensable to a productive and harmonious work place. However, this must be accomplished by **making appropriate standards of expected conduct clear,** and enforcing those standards firmly *and* fairly. Having left employees with no guidance as to what is expected of them in this regard, **employers may not equate ignorant thoughtlessness with willful misconduct.** This is not only counterproductive, but contrary to the terms of the Unemployment Compensation Law.

*Id.* at 784 (bold emphasis added).

I submit that Employer's harassment policy does not make clear that an employee's use of the word "zebra" to describe a bi-racial child in front of co-workers outside the office during a work break in the garage is a violation of the policy. Under the circumstances here, I believe that Employer should have warned Claimant that Employer considered her use of the word "zebra" on February 13, 2006, to be a violation of the policy. Then, if Claimant used the term in the future under the same or similar circumstances, there could be no question that Claimant deliberately violated the policy. Because Employer gave Claimant no warning, I cannot conclude that Claimant's use of the word under the circumstances here rose to the level of willful misconduct.

Accordingly, I would reverse.